IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BECKLEY DIVISION

MICHAEL KOSTENKO,

            Plaintiff,

v.                                              CIVIL ACTION NO.   5:16-cv-05326

CBS EVENING NEWS, et al.,

            Defendants.

**MEMORANDUM OPINION AND ORDER**

The Court has reviewed the *Motion by CBS Broadcasting Inc. and CBS Corporation for Summary Judgment* (Document 17) and *Memorandum of Law in Support* (Document 18), the *Motion in Opposition to Defendant's Motion for Summary Judgment* (Document 20, 21),[1] the *Memorandum in Support of Dr. Kostenko's Motion in Opposition to Defendant's Motion for Summary Judgment* (Document 19, 22), the *Reply Memorandum of Law in Support of Defendants' Motion for Summary Judgment* (Document 23), as well as all attached exhibits.   In addition, the Court has reviewed the Plaintiff's *Complaint* (Document 1-1).   For the reasons stated herein, the Court finds that the motion for summary judgment should be granted.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Plaintiff Michael Kostenko, a doctor of osteopathic medicine, initiated this action with a complaint filed in the Circuit Court of Raleigh County on May 20, 2016, naming the following

---

[1] The "motions" in opposition simply oppose the Defendants' motion for summary judgment, and do not separately seek relief, as the Defendants observed in their *Memorandum of Law in Opposition to Plaintiff's Motion in Opposition to Defendants' Motion for Summary Judgment."*   (Document 24.)

Defendants: CBS Evening News, CBS Inc., CBS Broadcasting Inc., CBS Corporation, Jim Axelrod, and Ashley Velie.  The Defendants[2] removed the matter to federal court on June 13, 2016.  After this motion was fully briefed, the United States brought criminal charges against the Plaintiff in Criminal Action No. 5:16-cr-221.  The Court granted the Plaintiff's request to stay this civil action pending resolution of the criminal charges to avoid any obligation to provide potentially self-incriminating testimony.  The criminal case was closed on August 23, 2017,[3] and the Court lifted the stay on August 28, 2017.  (Document 46.)

In the complaint, the Plaintiff alleges defamation and intentional infliction of emotional distress related to two news reports about the opioid epidemic in West Virginia broadcast by the Defendants.  The Plaintiff alleges that a January 6, 2016 news piece misrepresented his medical practice, the Coal Country Clinic, by "describing his medical facility as a pain clinic and us[ing] him as an example of a 'drug trafficker.'"  (Compl. at ¶ 8.)  He complains of negative statements made about another pain clinic highlighted in the January 6 report, shortly before mention of Dr. Kostenko's clinic.  He alleges that the statement providing the number of prescriptions he wrote was misleading because he uses short-term prescriptions.  The January 6 report states that the Defendants tried to contact the Plaintiff, which he alleges is untrue.  The Plaintiff further alleges that the Defendants relied upon misrepresentations by the West Virginia Department of Health and

---

[2] The Defendants assert that only CBS Broadcasting Inc. is a proper defendant, as CBS Corporation is included only as a parent company, CBS Evening News and CBS Inc. do not exist, and Jim Axelrod and Ashley Velie have not been served.

[3] The Plaintiff pled guilty to a single count of distribution of oxycodone not for legitimate medical purposes on April 25, 2016, after approximately two and a half days of a jury trial.  On August 23, 2017, the Court imposed a sentence of 20 years of incarceration, five years of supervised release, and a $50,000 fine.  Mr. Kostenko has filed a notice of appeal.  Because the parties have not had the opportunity to brief matters related to the criminal case herein, the Court will not consider those matters.

Human Resources (WVDHHR) and purposely published the January piece the evening before the Plaintiff had an administrative hearing with the WVDHHR.

The Plaintiff agreed to an interview with Jim Axelrod, which formed the basis of a second news report broadcast on April 13, 2016. He alleges that he expected the interview to focus on "corruption that has led to poverty, disease and crime in West Virginia" and not "about three patients that died in 2014." (*Id.* at ¶ 16.) The Plaintiff alleges that both the interview and footage of a class, which patients attend prior to receiving prescriptions, were edited to "connote Dr. Kostenko being a 'drug trafficker' and …[make] it look like an employee was handing out signed prescriptions to anyone that would walk into his clinic." (*Id.* at ¶ 18.) He alleges that the following statements in the April 13 broadcast [4] were defamatory: (a) a discussion about coordination of care with other physicians treating Dr. Kostenko's patients; (b) his response agreeing that he bore some responsibility for the death of Patient Three, followed by a voiceover stating "As he explains it, Kostenko wishes the hospital where his patient was being treated had reached out to him. He told us he didn't know how bad her condition was;" and (c) the number of prescriptions written by Dr. Kostenko. (*Id.* at ¶ 22.)

The Defendants produced nearly thirty exhibits, including the videos and transcripts of the broadcasts and articles at issue. In addition, the Defendants supplied the orders and hearing transcripts of administrative and court decisions related to the classification of Dr. Kostenko's practice as a pain clinic under state law, proceedings to revoke Dr. Kostenko's medical license, and decisions related to Dr. Kostenko's public health scholarship and his prior practice in workers' compensation. Those early proceedings were not mentioned in the broadcasts. However, Dr.

---

4 Both broadcasts were also reproduced as news articles available online, with similar content.

3

Kostenko brought up his history in the full, unedited interview to explain that he operated a cash-only practice from his home because of a decision barring him from receiving federal health payments due to an obligation to repay his scholarship, and a decision barring him from serving patients under the West Virginia Workers' Compensation system. He viewed both of those decisions as persecution based on his medical principles. The explanations of the decisions provided by the administrative bodies and courts rested on his failure to conform to applicable standards of care, unethical practices, and, as to the workers' compensation decision, improper billing.

The proceedings related to the pain clinic classification and Dr. Kostenko's medical license were mentioned briefly in the broadcasts, and the Defendants assert that those materials supported the facts and opinions expressed in the broadcast. Beginning in 2014, the WVDHHR Office of Health Facility Licensure and Certification (OHFLAC) and the Plaintiff communicated regarding newly instituted state regulations requiring pain clinics[5] to register and follow certain guidelines. The Plaintiff was denied a license to operate a pain clinic because he did not meet the educational requirements. He instituted a "life partner" program, requiring his pain patients to bring a life partner, who would agree to be a "patient" but who would not receive medical care or prescriptions, on each visit, and argued that this program brought the number of patients receiving prescriptions under fifty percent, such that the clinic no longer qualified as a pain clinic. The WVDHHR/OHFLAC concluded that the life partners were not patients and that the Coal Country Clinic fell within the definition of a pain clinic, requiring it to be licensed as such. The Plaintiff

---

5 W.Va. Code § 16-5H-2(d) defines a pain management clinic as a private facility "where in any month more than fifty percent of patients of the clinic are prescribed or dispensed opioids or other controlled substances…for chronic pain resulting from conditions that are not terminal."

also sought an exemption from the licensure requirement, asserting that his patients should be considered terminal because they are "individuals with pain associated with a process of disease that is life shortening." (Letter, Michael Kostenko, D.O. to Sylvia Fields, Program Director of WVDHHR OHFLAC, dated October 31, 2014) (att'd as Def. Ex. 13) (Document 17-13.) The WVDHHR OHFLAC rejected that request, and ultimately ordered that the Coal Country Clinic cease operation as an unlicensed pain clinic on May 8, 2015. The Raleigh County Circuit Court upheld that decision, including an accompanying monetary penalty, on August 17, 2016, though there were intervening appeals, including a remand for an additional hearing. (Document 17-11.) Each of the orders and hearings included discussion of problems with Dr. Kostenko's medical practice, including the lack of medical examinations, insufficient medical records, failure to utilize controlled substance monitoring programs, and failure to diagnose, or support a diagnosis of, conditions justifying pain medication.

In March 2016, the West Virginia Board of Osteopathic Medicine (WVBOM) instituted proceedings charging Dr. Kostenko with unprofessional and unethical conduct; deviation from accepted standards of practice; lack of care, skill, and proper treatment and dishonorable, unethical, or unprofessional conduct. The WVBOM based its charges on the deaths of three of Dr. Kostenko's patients and outlined the medical records and evidence regarding the care leading up to those deaths. The WVBOM summarily suspended Dr. Kostenko's medical license in its initial letter, dated March 4, 2016. The WVBOM held a hearing with expert testimony, as well as testimony from Dr. Kostenko regarding the patient deaths, Dr. Kostenko's methods of practice, and Dr. Kostenko's medical theories about pathologic adaptation, which he admitted were not accepted in the West Virginia medical community. The hearing examiner recommended a five-

5

year suspension in her June 6, 2016 *Amended Findings of Fact, Conclusions of law, and Recommendation of the Hearing Examiner* (Document 17-22), but in an order dated June 15, 2016, the WVBOM modified the recommendation to permanently revoke Dr. Kostenko's medical license based on the severity of the charges. (Document 17-23.)

The Defendants aired a broadcast on January 6, 2016, with a related news article entitled "West Virginia allows painkiller addicts to sue prescribing doctors." (Document 17-12, Ex. 1-2.) Both the article and the broadcast begin with an interview with a coal miner who developed an addiction to the prescription painkillers prescribed after a workplace injury. The article and broadcast included a description and footage of the clinic, since shut down, that the miner used, with cluttered, dirty exam rooms, and "starving birds stuck in roach-infested cages." (*Id*.) A DEA agent interviewed for the piece states "We are talking in a certain sense drug traffickers. They are doing nothing but writing and cranking out prescription after prescription after prescription." (*Id.*) There is general information about the scope of the opioid epidemic in West Virginia, and the piece discusses Dr. Kostenko and the Coal Country Clinic as one of twelve clinics in West Virginia told to shut down following inspections by the WVDHHR. The piece states that Dr. Kostenko has written more than 40,000 prescriptions in the last two years, and describes an attempt to visit the clinic, located "at the end of a two-mile logging road." (*Id.*) It notes that it is legal for doctors to write prescriptions, and the DEA agent states that "You have to be able to prove in court that their prescribing was for a non-medical necessity, or in such an egregious amount that it was negligent." (*Id.*)

The April 13 broadcast and article, entitled "West Virginia doctor investigated for deaths in opioid epidemic," focus on Dr. Kostenko specifically. Both begin with a general overview of

the opioid crisis in West Virginia, then introduce Dr. Kostenko by noting that he has written more than 40,000 prescriptions in the last two years.   The broadcast uses portions of an interview with Dr. Kostenko.   Dr. Kostenko agrees that he "may" have written 325 prescriptions for more than 19,000 oxycodone pills in the first week of January 2016.   (Document 17-12, Ex. 6-7.)   The broadcast includes videos of portions of a class session that Dr. Kostenko posted on YouTube, including a few seconds of the class lecture, followed by a patient receiving a prescription from a staff member.   Dr. Kostenko states that there is rarely a need for private consultations because "Everyone is on the same pain medication."   (*Id.*)   Mr. Axelrod states in a voiceover that in the last two years, "three of Dr. Kostenko's patients have died after overdosing on a cocktail of pills— including oxycodone—prescribed by Kostenko along with pills prescribed by other physicians." (*Id.*)   Dr. Kostenko admits that he is not in contact with other doctors treating his patients because the conversations would not be productive, and notes that there is not good communication between physicians generally.   A voiceover explains that Dr. Kostenko's medical license has been suspended and may be revoked, and the director of the state Board of Medicine states that it is legal for doctors to prescribe prescription drugs.

Finally, a voiceover states that "Dr. Kostenko didn't seem to help his case when discussing one of the deaths with us," and says that the patient received medication from another physician, as well as Dr. Kostenko, but Dr. Kostenko did not consult with that doctor.  (*Id.*)   Mr. Axelrod asks "Do you bear any responsibility for that death?" and Dr. Kostenko replies, "Yes, I do."   (*Id.*) Mr. Axelrod states, "As he explains it, Dr. Kostenko wishes the hospital where his patient was being treated had reached out to him.  He tells us he didn't know how bad her condition was."

7

(*Id.*)  In the full interview,[6] Dr. Kostenko explained that he gave the patient post-dated one-week prescriptions.  Mr. Axelrod asks if he bore any responsibility for her death, and Dr. Kostenko responds:

> Yes, I do. We should have been able to do everything we needed to complete her evaluation and put her in an environment where we could, at least for a temporary time, control the stressors and get to her what she needed biologically for survival.  Instead, she goes to Raleigh General Hospital two days before her death, and what did they do?  They gave her some catheters and sent her home. The standards of care is negligent. It's not based on proper life sciences, pathologic adaptation. We call integrative medicine. It's just not properly applied. We don't understand standard of care. Why the hormones like testosterone are dropping in relationship to this process. What a warning sign this is to potential catastrophe.  And – and I should be fighting a whole lot longer, so that we can establish what needs to be done for these folks, so that they have much better alternatives of good medicine. Is that standard of care? No. But it should be.

(Interview Transcript at p. 20, Document 17-12, ex. 5.)

## STANDARD OF REVIEW

The well-established standard in consideration of a motion for summary judgment is that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a)–(c); *see also Hunt v. Cromartie*, 526 U.S. 541, 549 (1999); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Hoschar v. Appalachian Power Co.*, 739 F.3d 163, 169 (4th Cir. 2014).  A "material fact" is a fact that could affect the outcome of the case.  *Anderson*, 477 U.S. at 248; *News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010).  A "genuine issue" concerning

---

6 The full interview lasted more than an hour and a half. The broadcast was approximately four minutes.

a material fact exists when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. *FDIC v. Cashion*, 720 F.3d 169, 180 (4th Cir. 2013); *News & Observer*, 597 F.3d at 576.

The moving party bears the burden of showing that there is no genuine issue of material fact, and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp.*, 477 U.S. at 322–23. When determining whether summary judgment is appropriate, a court must view all of the factual evidence, and any reasonable inferences to be drawn therefrom, in the light most favorable to the nonmoving party. *Hoschar*, 739 F.3d at 169. However, the non-moving party must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256. "At the summary judgment stage, the non-moving party must come forward with more than 'mere speculation or the building of one inference upon another' to resist dismissal of the action." *Perry v. Kappos*, No.11-1476, 2012 WL 2130908, at *3 (4th Cir. June 13, 2012) (unpublished decision) (quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)).

In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter," *Anderson*, 477 U.S. at 249, nor will it make determinations of credibility. *N. Am. Precast, Inc. v. Gen. Cas. Co. of Wis.*, 2008 WL 906334, *3 (S.D. W. Va. Mar. 31, 2008) (Copenhaver, J.) (citing *Sosebee v. Murphy,* 797 F.2d 179, 182 (4th Cir. 1986). If disputes over a material fact exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," summary judgment is inappropriate. *Anderson*, 477 U.S. at 250. If, however, the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case," then summary judgment should be

9

granted because "a complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322–23.

## DISCUSSION[7]

The Defendants argue that they are entitled to summary judgment because the statements regarding the unclean conditions of another clinic in the January 6 report are not "of and concerning" Dr. Kostenko, and the statements about Dr. Kostenko in both reports are substantially true. In addition, certain of the contested statements or implications are protected as opinions. The Defendants further argue that the editing of the interview did not materially change the meaning conveyed by Dr. Kostenko's full statement. In the alternative, the Defendants argue that their reports are privileged as "fair reports" of official proceedings. The Defendants assert that the claim for intentional infliction of emotional distress cannot survive if the Court grants summary judgment as to the defamation claim.

The Plaintiff argues that the motion for summary judgment is premature because discovery has not been completed. He argues that the various agency actions against him were the result of animus because of his allegations of corruption within those agencies and in the state generally. In addition, he suggests that the patient deaths may be attributable to other causes. He alleges that the news reports resulted in the loss of his medical license, the federal criminal investigation against him, and lawsuits by patients. The Plaintiff further argues that the news reports edited his

---

7 The parties' briefing did not include any discussion of Dr. Kostenko's status as a private or public figure for purposes of this defamation claim. The parties agreed in their Rule 26(f) report that this issue would require additional discovery. The parties have therefore treated Dr. Kostenko as a private figure for purposes of this motion, and the Court will do the same.

10

interview in a misleading way, falsely stated that the patients overdosed on oxycodone prescribed by him, and were misleading with respect to the numbers of prescriptions he wrote.

Under West Virginia law, "The essential elements for a successful defamation action by a private individual are (1) defamatory statements; (2) a nonprivileged communication to a third party; (3) falsity; (4) reference to the plaintiff; (5) at least negligence on the part of the publisher; and (6) resulting injury." Syl. Pt. 1, *Crump v. Beckley Newspapers, Inc.*, 320 S.E.2d 70, 74 (W. Va. 1983). "Defamation may be accomplished through inference, implication, innuendo or insinuation, as well as through direct reference." *Id*. at Syl. Pt. 3. Further, in cases involving a private individual, "in the absence of privileged communication, the standard is one of negligence, and the conduct of the defendant is to be measured against what a reasonably prudent person would have done under the same or similar circumstances." *Id.* at Syl. Pt. 2.

A statement of opinion, absent "a provably false assertion of fact[,] is entitled to full constitutional protection." Syl. Pt. 5, *State ex rel. Suriano v. Gaughan*, 480 S.E.2d 548, 551 (W. Va. 1996) (quoting Syl. Pt. 4, *Maynard v. Daily Gazette Co.,* 191 W.Va. 601, 447 S.E.2d 293 (1994)). Further, minor inaccuracies cannot support a cause of action; the law looks instead at "the substance, the gist, the sting, of the libelous charge…A statement is not considered false unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Id.* at Syl. Pt. 4. Altered or incorrect quotations that "effect[] no material change in meaning, including any meaning conveyed by the manner or fact of expression" do not cause "injury to reputation that is compensable as a defamation." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516 (1991). In short, a "statement is not considered false unless it

11

'would have a different effect on the mind of the reader from that which the pleaded truth would have produced.'" *Id.* at 517 (quoting R. Sack, Libel, Slander, and Related Problems 138 (1980)).

### A. *Timing of the Motion*

As an initial matter, the Court finds that the motion for summary judgment is not premature. The parties' Rule 26(f) report specifically contemplated an early motion for summary judgment based on publicly available documents and the content of the news reports and full interview. Furthermore, although the Plaintiff argues that the motion is premature, his counsel did not file an affidavit or declaration explaining that "facts essential to justify [his] opposition" were unavailable absent full discovery, as required by Federal Rule of Civil Procedure 56(d). The materials produced in support of this motion for summary judgment consist of publicly available documents related to proceedings both before and after the news reports in question, as well as the two news reports and the full interview. Additional materials would not be relevant to the legal issues asserted in the instant motion.

### B. *Defamation*

Reviewing each contested portion of the news pieces, the Court finds that the Defendants are entitled to summary judgment. The portion of the January 6 news piece discussing unhygienic conditions at another clinic does not reference the Plaintiff. Although both clinics are mentioned as examples of facilities that may contribute to the opioid epidemic in West Virginia, no reasonable viewer would confuse the specific conditions of the two clinics, nor would a reasonable viewer assume that the starving birds found in one clinic must also be found in all clinics with questionable prescribing practices.

12

Next, the Plaintiff challenges the inclusion of a statement by a DEA agent describing doctors who over-prescribe as drug traffickers "in a certain sense." (Document 17-12, Ex. 1-2.) After the piece mentions Dr. Kostenko, the number of prescriptions he writes, and the state's efforts to shut down his clinic, the DEA agent further explains that doctors may legally prescribe unless the DEA can prove that the prescriptions are not for medical necessity or are written in egregious quantities. The Plaintiff argues that the DEA agent's statement, included in a piece that discussed his clinic, implied that he operated a "pill mill" and was a drug trafficker. The Court finds that the Plaintiff has failed to point to any inaccuracies in the report. The state had found that Dr. Kostenko was operating a pain clinic, as defined by state law, without a license, and ordered him to cease. His clinic was still operating at the time of the January 6, 2016 report, and the state was continuing proceedings to shut it down. Reporting on those proceedings is privileged, even if the state's basis for action was wrong. *See*, Restatement (Second) of Torts § 611(privilege to publish a fair and accurate report of an official action or proceeding that deals with a matter of public concern, even if the information stated or relied upon by the agency producing the official action is inaccurate). The DEA agent's statement accurately reflects federal law with respect to drug prosecutions brought against physicians, who can be charged under 21 U.S.C. § 841, the same provision applicable to non-physician traffickers of controlled substances.

Both pieces referenced the number of prescriptions written by Dr. Kostenko. In rare cases, an accurate fact can be defamatory absent important context. *See, e.g.*, *Tomblin v. WCHS-TV8*, 434 F. App'x 205 (4th Cir. 2011) (unpublished) (finding summary judgment inappropriate where report about allegations of sexual abuse of a child at a daycare excluded the fact that the sexual contact involved one four-year-old touching the genitals of another four-year-old). Here, Dr.

13

Kostenko explained in his full April interview that he wrote post-dated short-term prescriptions for some patients, resulting in more prescriptions for the same number of pills. He did not offer any information on standard prescribing practices among responsible physicians for comparison. The broadcast did not include Dr. Kostenko's explanation that his prescriptions were often for one or two weeks (nor did it discuss the post-dated prescriptions). It did, however, offer some additional context on the scale of Dr. Kostenko's prescribing. He prescribed oxycodone to nearly 100% of his 800 to 1000 patients, he was one of West Virginia's top-ten prescribers of painkillers, and he admitted that he may have written 325 prescriptions for 19,000 oxycodone pills in a single week at the beginning of January 2016. Therefore, the Court finds that the news report contained sufficient context to eliminate the risk of misleading a reasonable viewer with respect to the amount of prescriptions written by Dr. Kostenko. The Plaintiff does not contend that the numbers reported are factually inaccurate, and the Court finds that the substance of the report with respect to the amount prescribed is substantially accurate.

Dr. Kostenko also contends that his full interview with Mr. Axelrod was edited unfairly. Specifically, he argues that the discussion about coordination of care and communication with other physicians treating his patients failed to convey his explanation that the conversations are not productive because when he has expressed concerns about other drugs prescribed by psychiatrists, in particular, the other doctors insist that the patient needs the prescribed medication. The broadcast did include Dr. Kostenko's more general responses that he would have an obligation to consult with other doctors "if the conversation would be productive," and that "there should be better communication between all physicians dealing with these drugs. There just is not." (Document 17-12, Ex. 6-7.) The Court finds that the included material adequately conveyed Dr.

14

Kostenko's statements regarding contact with other physicians. He admitted to not consulting with other doctors, explained that the conversations were not productive, and suggested that the lack of communication is a broad problem in the industry. The substance of the interview that aired accurately reflected Dr. Kostenko's full comments, and the portions excluded did not alter the overall gist or meaning of the statements.

Next, Dr. Kostenko argues that the Defendants maliciously edited the interview with respect to his response to a question asking whether he bore any responsibility for a patient death. He admitted that he did, then made a qualifying statement, as recounted in full *supra*. In the broadcast, the tape of Dr. Kostenko admitting that he bore some responsibility aired, then Mr. Axelrod paraphrased Dr. Kostenko's qualifying statement. In the full interview, Dr. Kostenko said his office should have been able to do more to control the patient's stressors, then gave a somewhat rambling response discussing the patient's treatment at the hospital before her death, his medical theories regarding pathologic adaptation, testosterone levels in the community as a whole, and his objections to the standard of care. Mr. Axelrod described Dr. Kostenko's response as stating that he wished the hospital had contacted him, and that he did not know how bad the patient's condition was.[8]

As an initial matter, the Court finds that the Defendants were entitled to rely on the official cause of death as to the patients who overdosed, as outlined in the WVBOM's documentation seeking to suspend or revoke Dr. Kostenko's medical license, even if further discovery raised questions regarding the facts surrounding the patient's death. However, any alteration in meaning

---

[8] At another point in the full interview, Dr. Kostenko discussed the patient's condition by noting that she was experiencing a number of stressors, including diet, tobacco use, and family issues, and indicated that inpatient treatment to control her environment and her stressors would have been ideal.

between Dr. Kostenko's statement and Mr. Axelrod's summation of that statement is not defamatory. In both, Dr. Kostenko admitted some responsibility, then made a qualifying statement. If anything, Mr. Axelrod's paraphrase reflects better on Dr. Kostenko than his own statement. Including the full statement that delved into Dr. Kostenko's differences with the medical community and the standard of care in West Virginia would not have been reasonable in a brief broadcast focused on the opioid crisis. Thus, on the issue of the patient's overdose death and the extent to which Dr. Kostenko admitted responsibility for that death, the Court finds that the broadcast and accompanying article were substantially accurate and were not defamatory.

More broadly, the Plaintiff argues that the broadcast was unfair in that it did not include the views he expressed about corruption in the medical and political establishments in West Virginia. In addition, he complains that the report did not include his belief that his termination from the worker's compensation program, the order that his clinic be closed for failure to obtain a license to operate as a pain clinic, and the suspension of his medical license were all persecution and retaliation due to his whistleblowing on corruption and advocacy for his alternative medical principles. Of course, news organizations are not obliged to publish the conspiracy theories espoused by subjects they report on or interview. The news reports were focused on the opioid epidemic in West Virginia and discussed Dr. Kostenko as a prescriber of oxycodone. Dr. Kostenko does not dispute that he prescribed oxycodone to nearly all of his patients. He barely addressed the medical need for those prescriptions in the interview, instead focusing on topics that were not relevant to the news report, despite the interviewer's efforts to focus questions on his prescribing practices. That left the Defendants to sift through disjointed statements to find relevant statements for broadcast. Comparison of the interview footage and the broadcast reveals

that they did so fairly and accurately. Therefore, after careful consideration, the Court finds that the Plaintiff has failed to demonstrate that there is a genuine dispute of material fact, and the Defendants have shown that they are entitled to summary judgment as to the defamation claim.

### C. *Intentional Infliction of Emotional Distress*

The West Virginia Supreme Court has established the following elements for IIED claims:

> (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

Syl. pt. 3, *Travis v. Alcon Labs., Inc.*, 504 S.E.2d 419, 421 (W. Va. 1998) (reaffirmed in *Hatfield v. Health Mgmt. Associates of W. Virginia*, 672 S.E.2d 395, 404 (W. Va. 2008). Where the First Amendment protects speech for defamation purposes, that speech is generally also protected from claims of intentional infliction of emotional distress. *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50 (1988).

For largely the same reasons that the Defendants are entitled to summary judgment as to the defamation claim, they are also entitled to summary judgment as to the intentional infliction of emotional distress claim. The content of the broadcasts was protected by fair report privilege, accurately reported on a matter of public concern, and/or fairly reflected the statements and views expressed by Dr. Kostenko.

Viewed independently of the defamation and First Amendment considerations, the intentional infliction of emotion distress claim would still fail. The news pieces included Dr. Kostenko as an example of a doctor being investigated for improper prescription practices, and the

17

April 2016 piece discussed patients who died of drug overdoses under his care. Substantially accurate reports on those matters do not constitute extreme and outrageous conduct under West Virginia law. In addition, many of the Plaintiff's arguments regarding his distress and damages cannot fairly be attributed to the Defendants' reporting. The official cause of death for some patients was listed as drug overdose. He published videos of the group classes to which he lectured, before providing patients with oxycodone prescriptions, on YouTube. He described his prescribing practices to various administrative bodies in detail, before and after the news reports. The FBI's application for a search warrant includes several pages of factual support for a probable cause finding, which was accepted by a Magistrate Judge, without once mentioning the CBS broadcasts. For the most part, those facts were not detailed in the broadcasts. Likewise, the WVBOM's statement of charges, findings of fact, and decision revoking Dr. Kostenko's medical license include extensive factual findings without reference to the CBS broadcasts. Thus, many of the incidents that distressed Dr. Kostenko bear little connection to the Defendants' actions. The Court therefore finds that the Defendants have demonstrated that there are no genuine disputes of material fact and they are entitled to summary judgment on the claim of intentional infliction of emotional distress.

## CONCLUSION

Wherefore, after thorough review and careful consideration, the Court **ORDERS** that the *Motion by CBS Broadcasting Inc. and CBS Corporation for Summary Judgment* (Document 17) be **GRANTED.** The Court further **ORDERS** that any other pending motions be **TERMINATED AS MOOT.**

The Court **DIRECTS** the Clerk to send a certified copy of this Order to counsel of record and to any unrepresented party.

ENTER: September 13, 2017

_____
IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA

19